# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) Def. I.D. #1102018112 | |
| v. | ) | |
| | ) | |
| ANTHONY NASTATOS | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: November 28, 2018
**Decided: May 13, 2019**

*Upon Defendant's Motion for Postconviction Relief (R-1)*

**DENIED**

**AMENDED MEMORANDUM OPINION**

Renee Hrivnak, Esquire, Deputy Attorney General, Department of Justice, 820 N. French Street, 5th Floor, Wilmington, DE 19801; Attorney for State of Delaware.

Christopher S. Koyste, Esquire Law Office of Christopher S. Koyste LLC, 709 Brandywine Blvd., Wilmington, DE 19809; Attorney for Petitioner Anthony Nastatos.

**KARSNITZ, J.**

# I.  INTRODUCTION

In December of 2012, a jury found defendant Anthony Nastatos ("Defendant" or "Nastatos") guilty of one count of Harassment[1] (as a lesser included offense of Stalking[2]), three counts of Breach Conditions of Bond During Commitment[3] ("BCBDC"), and sixteen counts of Non-Compliance with Bond Conditions[4] ("NCBC").[5]  In March of 2013, he was sentenced to thirty-two years at Level V, suspended after sixteen years for decreasing levels of probation.[6]  The Delaware Supreme Court affirmed the conviction in April of 2014.[7]  Defendant has now filed a Motion for Postconviction Relief under Superior Court Criminal Rule 61 on the basis that he was denied effective assistance of counsel at his 2012 trial and during his subsequent appeal in 2014.[8]

Defendant raises several claims under both the United States Constitution and the Delaware Constitution alleging that his conviction and his sentence resulted from violations of his right to due process and right to effective assistance of counsel. Specifically, he claims that trial counsel was ineffective for: (1) failure to limit references to prior bad acts (incarceration) and mental health issues and to request a

---

[1] 11 *Del. C.* § 1311.
[2] 11 *Del. C.* § 1312.
[3] 11 *Del. C.* § 2109.
[4] 11 *Del. C.* § 2113(c).
[5] D.I. 47
[6] D.I. 56.
[7] *Nastatos v. State*, 91 A.3d 562, 2014 WL 1512887 (Del. 2014).
[8] D.I. 81.

1

limiting jury instruction thereon, either during or after trial; (2) failure to object to a police officer's impermissible hearsay testimony; (3) failure to object to prejudicial errors committed by the State of Delaware (the "State") during its direct examination of the victim; (4) failure to object to the Court's limiting instruction on inadmissible evidence; (5) failure to review the victim's cell phone records; and, (6) failure to move for the trial judge's recusal before sentencing. Defendant claims that the State failed to provide him with the complaining witness' cell phone records, which *might* have contained *Brady*[9] material. He claims these cumulative errors denied him a fair trial. He alleges appellate counsel was ineffective on direct appeal for: (1) failure to raise cumulative errors at the trial; and, (2) failure to object to certain comments made by the judge before the sentencing hearing.

I find that Defendant has failed to satisfy the prejudice portion of the two-part test set forth in *Strickland v. Washington*[10] ("*Strickland*"), as discussed more fully below, as to his allegation of ineffective assistance of trial counsel. I further find that Defendant has failed to satisfy either the performance portion or the prejudice portion of the *Strickland* test as to his allegation of ineffective assistance of appellate counsel. Finally, I find that Defendant's speculative *Brady* claim is procedurally barred. Accordingly, the Motion is **DENIED.**

---

[9] *Brady v. Maryland*, 373 U.S. 83 (1963).
[10] 466 U.S. 668 (1984).

## II. BACKGROUND

### A. PROCEDURAL HISTORY

Nastatos was arrested and charged in October of 2010 with Stalking which was later reduced to two counts of Harassment.[11] In February of 2011, Nastatos was arrested and charged with Stalking and twenty counts of misdemeanor NCBC.[12] In all instances, Alexandra Koval ("Koval") was the complaining witness. The cases were consolidated after being transferred to the Superior Court in March 2011.[13]

The Superior Court ordered Nastatos to undergo a psychiatric evaluation in April 2011. On June 20, 2011, Nastatos was indicted by a grand jury.[14] As a result of allegations he violated the no contact order against him, Nastatos was re-indicted on March 12, 2012,[15] and again on May 21, 2012.[16]

A jury trial began on December 11, 2012.[17] At trial, the State entered *nolle prosequis* on six counts of misdemeanor NCBC after the Court excluded exhibits

---

[11] Def. I.D. # 1010004795.

[12] Def. I.D. # 1102018112.

[13] Defendant's charges were consolidated into a twenty-six count Superior Court indictment under which he faced: one count of Stalking, three counts of felony BCBDC, and twenty-two counts of misdemeanor NCBC.

[14] After the cases were consolidated and Nastatos was indicted, the Court of Common Pleas dismissed the case stemming from Nastatos' October 2010 charges. Def. I.D. # 1010004795.

[15] D.I. 18.

[16] D.I. 31.

[17] D.I. 50.

3

which it ruled were not properly authenticated.[18] Nastatos' motion for judgment of acquittal on the remaining counts was denied.[19]

After a four-day trial, a jury found Nastatos guilty of the remaining charges, including: three counts of felony BCBDC, one count of Harassment (as a lesser included offense of Stalking), and sixteen counts of misdemeanor NCBC.[20] A presentence investigation was conducted and on March 1, 2013, and, effective February 22, 2011, Nastatos was sentenced to 32 years at Level V, suspended after 16 years for decreasing levels of probation. Nastatos appealed his conviction and sentence and the Delaware Supreme Court affirmed the Superior Court's judgment.[21]

## B. THE OFFENSES

Nastatos' convictions arise from a series of events where he continuously sought out his former co-worker at her home, her place of work, by mail, and through social media despite police warnings, court orders, and incarceration. The facts are summarized as follows:[22]

> Nastatos and Alexandra Koval ("Koval") met in August 2009, while working at the same restaurant on Route 202 in New Castle County.

---

[18] D.I. 48; D.I. 50; D.I. 53.
[19] D.I. 50.
[20] D.I. 50.
[21] D.I. 68.
[22] The facts contained in this opinion were set forth by the Supreme Court in its opinion affirming Nastatos' conviction on direct appeal. *Nastatos v. State, supra,* at *1-3.

4

The two developed a friendly relationship. Soon after they met, Nastatos anonymously covered Koval's car with flower petals. He later admitted to the act and told her he had romantic feelings for her. Koval told Nastatos she did not have romantic feelings for him.

A few days later, Koval and Nastatos went shopping together, had dinner at a restaurant, and met another co-worker for drinks that night. Nastatos' behavior that night made Koval uncomfortable. Koval's discomfort forced her to cancel other plans they had made together. After that, she avoided Nastatos.

A couple of months later, Koval's car ran out of gas and she was required to take a different vehicle to work. Nastatos left a can of gas for Koval at work. Later, another can of gas was found at her house next to her car. After this, Nastatos began to regularly send Koval lengthy love poetry via text messages, and to wait for Koval after work. Koval told Nastatos that these overtures made her uncomfortable and asked him to leave her alone.

Nastatos then attempted to "friend" Koval on Facebook, under the pseudonym "Anakin Skywalker." Koval rejected this friend request. Next, Nastatos attempted to friend Koval from a Facebook account attached to his real name. Koval neither accepted nor denied this friend request. The pending friend request allowed Nastatos to send Koval private messages on the Facebook website.

In the spring of 2010, Nastatos sent Koval a late night text message containing a long poem. Koval told her coworker about the text, and Nastatos' previous behavior. The co-worker told the restaurant's management. Koval's manager examined the text messages and transferred Nastatos to another location.

Around this time, Koval also made her first report to the New Castle County Police Department ("NCCPD"). The NCCPD told Koval to block Nastatos' cell phone number, which she did. Nastatos then began regularly contacting Koval on Facebook, both through the account associated with his own name and the account with the name "Anakin Skywalker."

5

In various messages, Nastatos called Koval his "wife" and "soul sister." He also referenced Koval contacting the police, a necklace he had given Koval, and mutual friends and co-workers. Nastatos asserted his belief that the restaurant management was conspiring against him. In one message, Nastatos said, "I love you like I've never loved another person, but I can only do so much, especially when you are working against me." Nastatos also referenced a desire to "challenge" anyone for Koval's "hand."

In September 2010, Koval again contacted the NCCPD. Police visited Nastatos, who claimed he and Koval were dating. The police advised Nastatos to stay away from Koval. Nastatos then expressed a belief that the police, the restaurant management, and Koval's father were all "in on" keeping Koval and Nastatos apart.

The police visit did not dissuade Nastatos. He sent Facebook messages to Koval twice after the visit, referencing their prior dinner together and stating he was going to come to her new restaurant working location to see her. The NCCPD then arrested Nastatos. The Justice of the Peace placed bail conditions on Nastatos to have no more direct or indirect contact with Koval.

Nastatos continued to regularly send Koval Facebook messages, begging her to talk to him. Nastatos also sent a message to Koval's father discussing Koval and referencing the restaurant management's conspiracy to keep him and Koval apart. In January 2011, Nastatos sent Koval a Facebook message telling her the no-contact order did not matter because the two were bound by a higher power. Nastatos continued to regularly send Koval Facebook messages referencing her employer, the NCCPD, and his desire to meet with her.

On February 9, 2011, Nastatos sent Koval a message stating he would be at the Riverfront in Wilmington waiting for her. Koval was at her second job at a restaurant at the Riverfront and saw Nastatos outside of the window of the restaurant. The two did not interact.

Six days later, Nastatos arrived at the restaurant, which was Koval's primary place of employment, and attempted to speak with Koval. Koval ran to her car. As she was fleeing, Nastatos threw a ring box at her. Koval contacted the NCCPD. Nastatos sent Koval a Facebook

6

message saying that the restaurant manager would be holding the ring for Koval.

Four days later, Nastatos sent Koval the following Facebook message:

> Allie, I'm in love with you. Never in my life have I cared about one person more than you. Half of me wants to kill people for interfering. If you ask, I will.... I have had many people take a knee to me. Never have I kneeled to another person until I kneeled to you. I will be wearing our wedding bands until I see you again.

Koval contacted the NCCPD, who arrested Nastatos for additional charges. The Justice of the Peace Court issued a second no-contact order.

In March 2011, while incarcerated, Nastatos sent Koval a letter asking if she would marry him. He sent her a second letter five months later, referring to her as "Alexandra Nastatos" and professing his continued love for her. In this second letter, he also referenced her employer and his interactions with the NCCPD. Eight months later, Nastatos sent Koval a third letter. In this letter, he referenced her employer, the restaurant manager, the NCCPD, and Koval's father.

Nastatos was charged with one count of felony Breach of Conditions of Bond During Commitment for each letter. He was also charged with Stalking and one count of misdemeanor Non–Compliance with Conditions of Bond for each of the Facebook messages he sent after his bond condition was ordered.[23]

## C. Subpoenaed Cell Phone Records

Before trial, the State subpoenaed the victim's cell phone provider, requesting copies of "subscriber and call detail records for all incoming and outgoing calls." Text messages were neither requested nor received. The State reviewed the call

---

[23] *Nastatos v. State, supra,* at *1-3.

records and found that neither of the two telephone numbers associated with Nastatos appeared in those records. The State did not produce a copy of the call records to Trial Counsel, but it did notify Trial Counsel that he could review the records in full. Trial Counsel never arranged a time to review the cell phone records.

## D. TRIAL

Though initially found incompetent to stand trial, Nastatos was later deemed competent after receiving treatment at the Delaware Psychiatric Center.[24] Nastatos' case proceeded to trial and the jury was selected on December 11, 2012. Testimony began the next day.

### i. Complaining Witness' Testimony

The State's first witness in its case-in-chief was Koval. Koval's testimony included several statements describing the messages, Emails and letters that Nastatos had sent her. After the first mention of receiving a message from Nastatos, Trial Counsel objected on the grounds that a proper foundation was required under Delaware Rules of Evidence ("D.R.E.") 901 before Koval could testify that Nastatos

---

[24] Before trial, Nastatos was ordered to undergo a psychiatric evaluation. On June 13, 2011, he was deemed incompetent to stand trial due to mental illness and was subsequently treated at the Delaware Psychiatric Center. A second evaluation on January 26, 2012 found that his competency was restored and Nastatos was transferred to the Department of Correction to await trial. While incarcerated, Nastatos refused to take his medication and was again deemed incompetent. He returned to the Psychiatric Center for treatment. On August 8, 2012, Nastatos was evaluated for a third time and deemed competent to stand trial.

8

indeed sent the message. In sustaining the objection, the Court advised the State to "establish a foundation as to why she concluded [the message] was from [Nastatos] and what she based that on."[25]

Trial Counsel objected on numerous occasions during the State's direct examination of Koval to the non-authentication under D.R.E. 901 of the messages, Emails and letters referenced by the State. The Court conducted several sidebar conferences with counsel discussing how to lay a proper foundation, and instructed and corrected the State in front of the jury on several occasions. Trial Counsel also maintained a continuing objection to the conditional admission of all of the evidence on the grounds that the D.R.E 901 requirements had not been satisfied.

### ii. References to Mental Health and Prior Incarceration

During trial the State sought to introduce thirty-eight documents consisting of emails, text messages, Facebook messages and posts, and letters sent from Nastatos to Koval while he was in prison. Trial Counsel objected to the admission of each document, arguing that the State failed to properly authenticate them pursuant to D.R.E. 901. The Court conditionally admitted the evidence, provided the State could lay the proper foundation.

---

[25] App. to Appellant's Opening Br. Vol. I, at A-84.

In the documents there were several statements about Nastatos' prior incarceration and psychiatric hospitalization. The statements were written by Nastatos himself in various communications to Koval. Three references were made to Defendant's prior incarceration:

- ". . . But I did go to jail."[26]

- ". . . again I'll be in Gander."[27]

- "I've been in jail before, longest bit, one year. A lot of people can't handle jail; it definitely tests a person. Though I'd rather be free, I'm fine."[28]

Trial Counsel did not specifically object to these references, but maintained a continuing objection on Rule 901 grounds. The State suggested the possible need for a curative instruction based on the "[I]'ve been in jail before . . ." statement, but did not have preference as to when the instruction was given.[29] Trial Counsel asked that

---

[26] *See* App. to Def's Amended Motion for Postconviction Relief, at A45 (State's Ex. 2).

[27] A72, State's Ex. 9

[28] A62, 63, State's Ex. 36

[29] *See* A67 (Tr., at 86:8—88:10):

[STATE]: . . . What I wanted to bring up to Your Honor was that in Exhibit No. 36, the second letter that was admitted into evidence, the last page of the letter has a paragraph that states, "I've been in jail before, longest bit, one year. A lot of people can't handle jail, it definitely tests a person. Though I'd rather be free, I'm fine." And considering the statement, it's the State's belief that this statement should—that because of the statement being in the document that the jury has heard, that the Court should give the jury an instruction,

10

the instruction be given at the end of trial.[30] The trial testimony also included six references to Defendant's mental illness or hospitalization at a mental health institution:

- "First, I have an OCD"[31]

- "I ended up in a hospital"

- "I woke up in Meadow Wood"[32]

- "When I was in Meadow Wood"[33]

---

curative instruction indicating that any prior alleged or prior misconduct should be disregarded.

\* \* \* \*

[STATE]: . . . Your Honor, the State has no position as to when instructions should be given, we would leave that to defense counsel. But—

\* \* \* \*

COURT: So, what do you want me to do?

[STATE]: Your Honor, the State believes that a simple curative instruction either—you know, depending on when defense counsel wants this instruction, when—you know, just that—you know, an instruction that, you know, uncharged misconduct, meaning uncharged in this particular case if there's been any inferences, a limiting instruction, you know, that the jury should just disregard it.

COURT: Well, Mr. Flockerzie. Do you have a position?

[TRIAL COUNSEL]: I certainly don't oppose. I believe that the State may now be planning to bring in someone from the Department of Corrections to discuss the letters, to the extent that if that's the case, perhaps a general curative at the end of trial while instructing the jury would be appropriate and all-encompassing of all of this.

[30] *Id.*
[31] A48, State's Ex. 4
[32] A55, State's Ex. 22
[33] A56, State's Ex. 24

11

- "I was diagnosed delusional"[34]

- "They sent us to the State Hospital—they sent me to the State Hospital for treatment because I believe the above statement. They pumped me full of drugs for months. . ."[35]

Trial Counsel did not specifically object to any of these references, although he maintained a continuing objection on D.R.E. 901 grounds.

### iii.  Officer's Testimony

On direct examination of Officer Kerri Clarke, the State elicited testimony about prior statements made by witness Koval to Officer Clarke. These prior witness statements were not inconsistent with Koval's testimony, were not offered to rebut an "express or implied charge against [Koval] of recent fabrication or improper influence or motive," nor were they identifying Defendant. Thus they constitute hearsay under D.R.E. 801(d)(1) and were inadmissible. The State did not seek to admit the prior witness statement under 11 *Del. C.* §3507. Trial Counsel did not object to this testimony.

### iv.  Jury Instruction and Verdict

When the State concluded its case-in-chief, the Court excluded six of the thirty-eight exhibits that had been conditionally admitted because the State did not

---

[34]    A62, State's Ex. 36
[35]    A70, State's Ex. 37

12

lay a sufficient foundation for them. As a result, the State entered *nolle prosequis* on the six related counts of NCBC.

At the close of the evidence, the Court instructed the jury. The jury was not given a limiting instruction as to either the references to Nastatos' prior incarceration or his mental health problems.[36]

Trial concluded on December 19, 2012. Nastatos was convicted of one count of Harassment (as a lesser included offense of Stalking), three counts of felony BCRDC, and the remaining sixteen counts of misdemeanor NCBC. A presentence investigation was ordered, and sentencing was scheduled for the following March. No post-verdict motions were filed.

### E. SENTENCING

On March 1, 2013, when the State moved for Nastatos' sentencing, Trial Counsel immediately asked the Court for a sidebar conference. At sidebar, Trial Counsel asked to put on the record comments that were allegedly made by the Court during or before trial:

> TRIAL COUNSEL: What I want to put on the record is that during either the pretrial or during the trial conference in Chambers, the Court indicated to counsel that the Court has four daughters, and that if the Defendant had been doing what he was doing in this case to the Court's daughters, then the Court would have to stop him. And I forget the exact language used, but it was: I would have to run him down or gun him down, or stop him.

---

[36] Jury Instructions, D.I. 49.

COURT: Mr. Flockerzie, first of all, I don't use that kind of terminology. I might have said he'd tuck his head between his legs and kiss something good-bye, but personally I wouldn't have said that. But what are you telling me? That if he was found guilty, that I would sentence him accordingly because I have four daughters?

TRIAL COUNSEL: What I've put on the record is my best recollection of what the Court said at that conference. And I'm doing nothing more than putting that into the record.

STATE: Your Honor, Mr. Flockerzie did not raise any issue of concern about Your Honor presiding over the trial. The State doesn't recall any statement regarding a weapon, or running down, anything like that.

\*     \*     \*     \*

COURT: Well, [Trial Counsel] put it on the record, so I don't think we can go forward unless and until we have an evidentiary hearing. Mr. Flockerzie, I have no recollection, but it has to be put on. It has to be—what, in effect, you're saying is you are moving for my recusal as the sentencing Judge because of prior misconduct and asking for a new trial. That's essentially what you're asking for.

Well I don't know—I'm not sure how we stand, because I didn't have anything to do with the jury verdict, and you haven't complained about any evidentiary rulings. You just don't want me to sentence him because of comments that you remember.

Again, anybody who has been around here, any of the people that have been in my court, know I wouldn't even have said that. Now, I might have said some other strange comment, but I wouldn't have said—used that terminology. That's why I said I think you're wrong.

Look it makes no nevermind to me. I assume you're going to file a motion for a new trial.[37]

---

[37] A-103 (03/01/2013 Sentencing Tr., at 3:3-#-18; 3:23-4:6; 4:15-5:12).

14

The State continued to express its objection to delaying sentencing because Trial Counsel had never before raised concerns about the trial judge presiding over the trial or sentencing, including in the months after trial concluded. The State argued that raising the issue on the day of sentencing was "disheartening" because the presentencing investigation was complete, the victim was present in the courtroom, and the State was "ready to go." Additionally, the State argued that it did not know what Trial Counsel was asking for procedurally because Trial Counsel did not make a request other than to "put something on the record." Trial Counsel responded that he was "not asking for recusal," but rather, just wanted the alleged statements to be included in the record.[38]

After the sidebar conference concluded, the Court proceeded with the sentencing hearing. The trial judge stated in open court:

> [C]ounsel for the defense has raised at sidebar a belief that the Court prior to trial or going to trial, I'm not sure at which point, because he didn't specify the date, indicated that if Mr. Nastatos were found guilty, the Court would react negatively.
>
> Now, I have no recollection of that, but the defense is entitled to an evidentiary hearing and the ability to file a motion for postconviction relief based upon that. I did not have any feeling about his guilt or innocence, and I had no feeling about sentencing one way or the other, as far as I can recall. Nor do I ever recall referencing his sentence. But we need to have a formal evidentiary hearing.

> \* \* \* \*

---

[38] *Id.*, at 3:3—16:18).

15

It was not raised at any point in time. But, in any event, everybody's here. We'll go forward with it. And I gather, Mr. Flockerzie, again, you indicated, implicitly stating, that I—it doesn't bother me. It is what it is—somehow made a statements [sic] that indicated some sort of closed-mind bias at a point either prior to trial of during trial, which were not—about which no complaint was made or any comment noted that somehow invalidates the jury's verdict or that somehow I did something to invalidate the jury's verdict and indicates a closed mind at this date March 1st from a December trial.[39]

The Court sentenced Nastatos to thirty-two years at Level V, suspended after sixteen years based on the Court's finding that there were aggravating factors present including, past violent behavior and disregard for court orders and incarceration.

## F. DIRECT APPEAL

Through counsel, Defendant appealed his conviction and sentence to the Delaware Supreme Court and raised two claims: (1) the trial court abused its discretion when it allowed the State to present thirty-eight documents to the jury, including several Facebook messages, without properly authenticating them under D.R.E. 901; and (2) the trial court acted with a closed mind and relied on impermissible and erroneous facts when it imposed a cruel and unusual punishment by deviating upward from the presumptive sentences.[40] While the appeal was pending, however, Appellate Counsel withdrew the first claim after determining it

---

[39] *Id.,* at 14:22-!5:13; 15:22-16:12.

[40] *Nastatos v. State*, 2013 WL 3283811 (Del. 2013) (Appellate Brief).

was no longer justiciable in view of the Delaware Supreme Court's opinion in *Parker v. State*.[41]

In regard to the remaining claim - that the trial court acted with a closed mind and imposed a cruel and unusual punishment - the Supreme Court affirmed this Court's judgment, finding:

> The record reflects that the trial judge did consider Nastatos' mental health history. There is no evidence that the trial judge relied on inaccurate or unreliable information. The sentence was within the statutory range and, thus, within the "broad discretion" of the trial court.
>
> The record also demonstrates that, prior to sentencing, the trial judge addressed Nastatos' "closed mind" argument. Specifically, the trial judge stated: "I do not think I have a closed mind. I do not think I'm biased. I sentence people for murder, rapes, and all kinds of things. As I said in a recent homicide case, . . . it's not personal. It's just business. And in this case it's just business." These statements indicate the trial judge did not sentence Nastatos with a closed mind.
>
> \*     \*     \*     \*
>
> Nastatos has not raised the threshold inference required by the first part of the two-part inquiry [for evaluating Eighth Amendment claims of disproportional sentencing]. The trial judge, considering the record evidence and Pre–Sentence Report, found multiple aggravating factors, including past violent behavior and a flagrant disregard for court orders and incarceration. There is no indication that the trial judge's sentence was "grossly disproportional" to the crimes Nastatos committed when considered with the aggravating factors.[42]

---

[41]   85 A.3d 682 (Del. 2014) ("[T]he trial judge as the gatekeeper of evidence may admit the social media post when there is evidence sufficient to support a finding by a reasonable juror that the proffered evidence is what its proponent claims it to be. . . .[T]he jury will then decide whether to accept or reject the evidence.") (internal quotations removed).

[42]   *Nastatos*, 2014 WL 1512887, at *5-6.

## G. POSTCONVICTION PROCEEDINGS

Nastatos filed a *pro se* motion for postconviction relief on April 8, 2015. The Court thereafter granted his motion for appointment of counsel, and counsel was appointed on March 24, 2016. Appointed Counsel then filed Defendant's Amended Motion for Postconviction Relief. On March 18, 2018, the Court denied Nastatos' request to compel the State to produce Koval's cell phone records in connection with his motion. An evidentiary hearing was held on July 23, 2018, and both trial and appellate counsel testified. The parties submitted written post-hearing arguments, the last of which was the Defendant's Reply filed on November 12, 2018.[43]

## III. DISCUSSION

## A. PROCEDURAL BARS UNDER RULE 61(i).

Before addressing the merits of a defendant's motion for postconviction relief, I must first apply the procedural bars of Superior Court Criminal Rule 61(i).[44] If a procedural bar exists, I will not address the merits of the postconviction claim.[45] Under Delaware Superior Court Rules of Criminal Procedure, a motion for post-conviction relief can be barred for time limitations, successive motions, procedural default, or former adjudication.[46] A motion exceeds time limitations if it is filed more

---

[43] *See,* D.I. 112, 117, 118.
[44] *Younger v. State,* 580 A.2d 552, 554 (Del. 1990).
[45] *Id.*
[46] Super. Ct. Crim. R. 61(i).

18

than one year after the conviction becomes final, or, if it asserts a retroactively applicable right that is newly recognized after the judgment of conviction is final, more than one year after the right was first recognized by the Supreme Court of Delaware or the United States Supreme Court.[47] Grounds for relief "not asserted in the proceedings leading to the judgment of conviction" are barred as procedurally defaulted unless the movant can show "cause for relief" and "prejudice from [the] violation."[48] Grounds for relief formerly adjudicated in the case, including "proceedings leading to the judgment of conviction, in an appeal, in a post-conviction proceeding, or in a federal habeas corpus hearing" are barred.[49] The bars to relief do not apply either to a claim that the Court lacked jurisdiction or to a claim that pleads with particularity that new evidence exists that creates a strong inference of actual innocence,[50] or that a new retroactively applied rule of constitutional law renders the conviction invalid.[51]

Most of Defendant's claims are *not* procedurally barred. The Motion was timely filed[52] and it is his first postconviction motion.[53] Additionally, apart from one claim of a *Brady* violation which *is* procedurally barred for failure to raise it below

---

[47] Super. Ct. Crim. R. 61(i)(1).

[48] Super. Ct. Crim. R. 61(i)(3).

[49] Super. Ct. Crim. R. 61(i)(4).

[50] Super. Ct. Crim. R. 61(i)(5).

[51] Super. Ct. Crim. R. 61(d)(2)(i) and (ii).

[52] Super. Ct. Crim. R. 61(i)(1).

[53] *Id.* at 61(i)(2).

(see discussion, *infra*), Defendant's motion is based on claims of ineffective assistance of counsel, which can only be raised in a motion for postconviction relief.[54] The issues presented in this motion were not formerly adjudicated because ineffective assistance of counsel claims are not addressed by the Delaware Supreme Court on direct appeal.[55] Therefore, the claims made in Defendant's postconviction motion (with exception of his *Brady* claim) are not procedurally barred.

### B. NASTATOS HAS FAILED TO DEMONSTRATE THAT, BUT FOR THE CLAIMED UNPROFESSIONAL ERRORS OF TRIAL COUNSEL, THE OUTCOME OF THE TRIAL WOULD HAVE BEEN DIFFERENT.

Nastatos brings numerous claims of ineffective assistance of counsel, which are assessed under the two-part standard established in *Strickland v. Washington*.[56] Under *Strickland*, Defendant must show that (1) Trial Counsel's representation "fell below an objective standard of reasonableness;" and (2) the "deficient performance prejudiced [his] defense."[57] In considering the performance portion, the Court was mindful that "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."[58] *Strickland* requires an objective analysis, making every effort "to eliminate the distorting effects of

---

[54] *Id.* at 61(i)(3).
[55] *Id.* at 61(i)(4).
[56] 466 U.S. 668 (1984).
[57] *Id.* at 687.
[58] *Id.* at 690.

20

hindsight" and to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[59] And, "strategic choices about which lines of defense to pursue are owed deference commensurate with the reasonableness of the professional judgments on which they are based."[60]

As to the prejudice portion, a petitioner must demonstrate that there exists a reasonable probability that, but for counsel's unprofessional errors, the outcome of the trial would have been different.[61] Even if counsel's performance was professionally unreasonable, it would not warrant setting aside the judgment of conviction if the error had no effect on the judgment.[62] A showing of prejudice "requires more than a showing of theoretical possibility that the outcome was affected."[63]

*Strickland* teaches that there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in a particular order, or even to address both portions of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged

---

[59] *Id.* at 689.
[60] *Id.* at 681.
[61] *Id.* at 687; *Zebroski v. State,* 822 A.2d 1038, 1043 (Del. 2003); *Wright v. State,* 671 A.2d 1353, 1356 (Del. 1996).
[62] *Strickland,* at 691.
[63] *Frey v. Fulcomer,* 974 F.2d 348, 358 (3d Cir. 1992).

21

deficiencies. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed.[64] In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.[65]

Trial counsel testified that he had strategic reasons for failing to pursue a limiting instruction regarding Nastatos' criminal and mental health history.[66] Trial counsel did *not* provide strategic reasons for failing to object to Officer Clarke's hearsay testimony,[67] for failing to object to the State's direct examination of the complaining witness,[68] for failing to object to the Court's jury instruction on inadmissible evidence,[69] for failing to review the complaining witness' cell phone records,[70] or for failing to file a motion for recusal of the judge before sentencing.[71] However, in light of the Court's determination that Nastatos suffered no prejudice, it need not evaluate trial counsel's strategy under the performance portion of the *Strickland* test.

---

[64] *Strickland,* at 697.
[65] *Id.* at 696.
[66] Aff. of Trial Counsel ¶1, Dec. 22, 2016.
[67] Aff. of Trial Counsel ¶2, Dec. 22, 2016.
[68] Aff. of Trial Counsel ¶3, Dec. 22, 2016.
[69] Aff. of Trial Counsel ¶4, Dec. 22, 2016.
[70] Aff. of Trial Counsel ¶5, Dec. 22, 2016.
[71] Aff. of Trial Counsel ¶8, Dec. 22, 2016.

### i. *The BCRDC and NCBC Charges.*

Despite the multiple counts charged in the Indictment, Nastatos was charged with violations of only three separate criminal statutes, two of which require proof of very similar elements. In order to be guilty of BCRDC a person must: (1) knowingly; (2) breach a condition of bail; (3) while committed in default of bail; (4) in connection with a felony.[72] Similarly, in order to be guilty of NCBC, a person must: (1) knowingly; (2) breach a condition of release.[73] For all of the charges for both of these crimes, the condition of bail Nastatos was alleged to have breached was having contact with Koval. For the BCRDC charges, there was no dispute that Nastatos was confined in default of bail on a felony charge and that there was a no contact order imposed for that felony charge. For the NCBC charges there was no dispute that a condition of Nastatos' release was that he have no contact with Koval. The only issue for both the BCRDC and NCBC charges was whether Nastatos knowingly had contact with Koval.

The evidence that Nastatos had contact with Koval was extensive and incontrovertible. The content and context of the communications, all of which were read to the jury by Koval during her testimony, clearly established that Nastatos was

---

[72] 11 *Del. C.* § 2109(c)(1)
[73] 11 *Del. C.* 2113(c).

23

communicating with Koval in breach of the no contact orders.[74] In addition, Nastatos admitted to Officer Clarke that he sent communications to Koval.[75] Finally, in Trial Counsel's closing argument, which the motion does not argue failed *Strickland's* performance standard, counsel could only attempt to persuade the jury to impose an artificially high bar for proof beyond a reasonable doubt, arguing that the State's investigation was inadequate because it did not seize Defendant's computer, contact Facebook, or check cell phone tower information to see if Defendant's cell phone pinged messages off of them.[76] Apparently, the necessary implication of that argument was that some unknown individual engaged in a lengthy campaign of harassing Koval, while impersonating Nastatos for some unknown reason. No reasonable juror would consider that explanation as raising a reasonable doubt of Defendant's guilt. Thus, it is clear to me that the jury's verdicts on the BCRDC and NCCB counts was not affected by knowing that Nastatos had been incarcerated and had mental health issues, any alleged improper hearsay testimony from Officer Clarke, any alleged improper questioning of the complaining witness on direct examination, or the absence of an adequate limiting or cautionary instruction. In short, the evidence against Nastatos on these counts was so strong

---

[74] *See generally,* Dr. Exam. Alexandra Koval, 12/12/2012 at 26:16-201:8 and 12/13/2012 at 9:13-48:12.

[75] 12/18/2012 Re-Dir. Exam Off. Kerrie Clarke at 54:5-7; *see also* State's Ex. 41.

[76] 12/19/2012, Def. Summ. At 54:6-56;14.

24

that any the claimed performance errors by Trial Counsel had no bearing on the jury's verdicts. There is very little chance the outcome would have been different.

*ii  The Stalking Charge.*

The Stalking charge alleged that Nastatos: (1) knowingly engaged in a course of conduct; (2) directed at Koval; (3) that would cause a reasonable person to fear physical injury, or suffer other significant mental anguish or distress; and (4) that Nastatos violated a no contact order.[77] On this charge, the only real controverted issue was the effect Nastatos' conduct had on Koval. Accordingly, the jury was instructed on the lesser included offense of Harassment.[78] The jury was instructed on two subsections of Harassment, the most pertinent being that a person is guilty of Harassment when he: (1) communicates with another person by any form of written or electronic communication; (2) in a manner which he knows; (3) is likely to cause annoyance or alarm.[79] On this charge, Trial Counsel's strategy and performance in his closing argument, which again are not the subject of a postconviction challenge, was twofold. First, he tried to convince the jury that Koval did not experience fear of physical injury or suffer significant mental anguish or distress.[80] In this effort, he was successful, since Defendant was convicted of Harassment, and not the more

---

[77]  Re-Indictment, Count I, D.I. 57.
[78]  Jury Instructions, at 9-11, D.I. 49.
[79]  *Id.*
[80]  12/19/2019, Def. Summ., at 56:15-60:15.

25

serious charge of Stalking. Second, he argued that the State had not proven that Nastatos had been the one who communicated with Koval. For the same reasons this effort had very little chance of success as to the BCRDC and NCCB, it had no success with this charge either. Accordingly, Defendant has failed to meet the prejudice portion of the *Strickland* test as well.

## C. The *Brady* Claim.

Defendant's next claim is that the State *potentially* committed a *Brady* violation by not producing a copy of the victim's cell phone records to Trial Counsel. Coupled with this claim is Defendant's assertion that Trial Counsel was ineffective for failing to review the victim's cell phone records.[81]

Defendant argues that the State failed to produce a certified copy of Koval's cell phone records to Trial Counsel in violation of its obligations under *Brady v. Maryland*.[82] However, as discussed above, Defendant's claim is procedurally barred under Superior Court Criminal Rule 61(i)(3) because he failed to assert this ground for relief in the proceedings leading to his conviction.[83] He has also failed

---

[81] With respect to the ineffective assistance of Trial Counsel claim based on his failure to review the victim's cell phone records, see discussion above.
[82] 373 U.S. 83 (1963).
[83] Super. Ct. Crim. R. 61(i)(3).

to meet the miscarriage of justice exception, which requires a colorable *Brady* claim.[84]

Even if Defendant's *Brady* claim was *not* procedurally barred by failing to raise it below, there was no *Brady* violation by the State. To establish a *Brady* violation, a defendant must show (i) evidence exists that is favorable to the accused because it is either exculpatory or impeaching; (ii) that evidence is suppressed by the State; and (iii) suppression prejudices the defendant.[85] Although it is a violation of a defendant's due process rights for a prosecutor to withhold favorable evidence, the prosecutor is only required to disclose evidence that "if suppressed, would deprive the defendant of a fair trial."[86]

First, the records were not *Brady* material because they did not contain any exculpatory or impeaching material. Defendant's claim is entirely speculative; just because he alleges that the cell phone records *might* have contained *Brady* material does not make it so. The State claims that the cell phone records contain none of the text messages sent from Nastatos to Koval. Defendant has not rebutted this claim. Because Nastatos has failed to show that the cell phone records contained *Brady* material, I find that the State did not violate its duty under *Brady*.

---

[84] *Id.* at 61(i)(5). *See also, Johnson v. State,* 129 A.3d 882, 2015 WL 8528889, at *3 (Del. 2015) (TABLE).

[85] *State v. Wright,* 67 A.3d 319, 324 (Del. 2013).

[86] *United States v. Bagley,* 473 U.S. 667, 675 (1985); *Michael v. State,* 529 A.2d 752, 755 (Del. 1987).

Second, there was no *Brady* violation because Trial Counsel was given an opportunity to review the records. The State argues it did not produce a copy of the records to Trial Counsel because the records did not reference either of Nastatos' telephone numbers, they would have been heavily redacted if produced, and the State did not intend to use the records as evidence at trial. Nevertheless, the State made the cell phone records available to Trial Counsel for his review. Thus, even if the cell phone records contained exculpatory or impeachment material, the State did not violate the rule because it did not "suppress" the evidence, as required under the second *Brady* test, as the records were available to Trial Counsel.

Third, Nastatos cannot show he was prejudiced. He frames his claim as a "potential" *Brady* violation but has failed to show that the material either qualified as exculpatory *Brady* evidence, or that it was suppressed by the State. Accordingly, I will not assume he suffered prejudice. Nastatos' argument that the State committed a *Brady* violation fails.[87]

**D. TRIAL COUNSEL AND APPELLATE COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO RAISE "CUMULATIVE DUE PROCESS ERROR" AT TRIAL AND ON APPEAL.**

---

[87] In his motion, Defendant also asked the Court to require the State to produce the victim's cell phone records during the postconviction proceedings so that Appointed Counsel could determine the merits of Nastatos' "potential *Brady*" and ineffective assistance of counsel claims. The Court denied that request by letter dated March 15, 2018, holding that Defendant failed to show good cause.

28

Defendant also argues that his constitutional right to a fair trial was denied due to cumulative error, and that both Trial Counsel and Appellate Counsel rendered ineffective assistance of counsel because they failed to raise this issue at trial and on appeal, respectively.

Because there was no factual claim of error directed at Trial Counsel, Trial Counsel made no comment on this claim. Defendant has shown me no prejudicial error with respect to Trial Counsel (see *Strickland* discussion, above), and in the absence of proven error his claim must fail.

Nastatos next claims that his Appellate Counsel was ineffective for failing to argue "cumulative due process error" on appeal. This claim fails under both portions of the *Strickland* test.

First, the decision as to which arguments to raise on appeal is a strategic decision. Indeed, in her affidavit, Appellate Counsel states that she did not raise cumulative error on appeal because based on her "experience ... there is little to no chance of success of a 'cumulative error' argument that is based on issues that were not preserved at trial."[88] Thus, Appellate Counsel's choice not to raise cumulative error on appeal was reasonable under the performance portion of the *Strickland* test. Appellate Counsel's tactical decision not to argue cumulative error on appeal does not amount to ineffective assistance of counsel.

---

[88] Aff. of Appellate Counsel ¶15, Aug. 7, 2017.

29

Second, Defendant cannot show prejudice; i.e., that but for the failure to argue cumulative error on appeal, the result of the appeal would have been different. Thus, Appellate Counsel's choice not to raise cumulative error on appeal does not run afoul of the prejudice portion of the *Strickland* test.

### E. DEFENDANT IS NOT ENTITLED TO A NEW SENTENCING HEARING.

Defendant also argues that he is entitled to a "new sentencing hearing before a different judge" because "the trial court sentenced Nastatos with a closed mind and based on impermissible and erroneous facts."[89] The State opposes resentencing, arguing that this argument is procedurally barred under Superior Court Criminal Rule 61(i)(4) (former adjudication) as this precise issue was raised on direct appeal and rejected by the Supreme Court.[90] Defendant attempts to distinguish between the "closed mind" argument and the recusal argument (see below). I need not address that purported distinction because the Supreme Court has already settled the "closed mind" argument.[91] I reject the recusal argument as to me it is the identical argument renamed. There is no merit to it whatever label it is given.

### F. DEFENDANT'S REQUEST FOR AN EVIDENTIARY HEARING IS MOOT.

---

[89] Aff. of Appellate Counsel ¶3, Aug. 7, 2017.

[90] *See Nastatos v. State*, 921 A.3d 562 (Del. 2014).

[91] *Id.*

Finally, Nastatos argues that a Rule 61(h)[92] evidentiary hearing is required "to fully develop the factual record in light of the claims raised in this motion" and in order to comply with due process. This is mooted by the fact that the Court held such an evidentiary hearing on May 14, 2018.

## IV.   CONCLUSION

Therefore, for the foregoing reasons, Defendant Anthony Nastatos' motion for postconviction relief is **DENIED**.

---

[92] *See* Super. Ct. Crim. R. 61(h).